## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANTHONY WILLIAMS** | : | **No. 11-223-1** |

## MEMORANDUM

PRATTER, J.                                                                      AUGUST _17_, 2020

Anthony Williams moves for a reduction of his sentence under 18 U.S.C.

§ 3582(c)(1)(A)(i), claiming that his age and health conditions place him at a high risk of severe

illness in the wake of COVID-19. He also claims his mother contracted the virus, but has

recovered, and needs additional assistance at home. On these bases, Mr. Williams seeks immediate

release from FCI Gilmer. For the reasons that follow, the Court denies Mr. Williams's request.

### BACKGROUND

### I.      Mr. Williams's Criminal Conduct

Mr. Williams was charged with and ultimately convicted of 19 counts of conspiracy to

commit access device fraud and bank fraud, access device fraud, bank fraud, aggravated identity

theft, and identity theft. His criminal conduct spanned from 2006 to 2010, and he was the organizer

and leader of a scheme to use stolen personal identifiers and bank account and credit card numbers

to obtain additional cards on existing accounts, fraudulently purchase merchandise and obtain cash

advances, and obtain additional checks on existing bank accounts. At sentencing, the Court

adopted the findings of the pre-sentencing investigation that there were more than 100 victims.

Mr. Williams's conduct caused intended losses of over $1.8 million. The Court sentenced Mr.

Williams to 259 months of imprisonment, 235 months on the bank fraud counts, and a consecutive

sentence of 24 months on the aggravated identity theft counts. The Court also sentenced him to lesser concurrent sentences on the access device and conspiracy counts, and imposed a five-year period of supervised release and a special assessment of $1,900. Mr. Williams was also ordered to pay restitution in the amount of $348,366.73. The federal sentence ran consecutively to a ten-year New Jersey state sentence which had been imposed for similar offenses committed with some of the same co-defendants. The Third Circuit affirmed the conviction and sentence. *See United States v. Williams*, 591 F. App'x 78 (Oct. 31, 2014). Mr. Williams is currently serving his sentence at FCI Gilmer.

## II.     Mr. Williams's Medical Concerns

The Court has not been provided with Mr. Williams's medical records. However, Mr. Williams identifies acute bronchitis, hypertension, and his obesity as medical conditions that render him at high risk of complications from COVID-19. The Court notes that in his reply, Mr. Williams appears to have abandoned his reliance on a pre-diabetic state as further support for his alleged vulnerability. *See* Def.'s Reply, p. 4 n. 4 ("Mr. Williams also reports being pre-diabetic but the records do not show that BOP has performed the necessary blood test . . . to confirm this condition.")

## III.    BOP's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority,"[1] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at

---

[1]     BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Aug. 6, 2020).

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Aug. 1, 2020).   The

protocol set forth in this plan established a multi-phase framework which requires BOP facilities

to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i.  This plan

further addresses social distancing, hygienic and cleaning protocols, and the quarantining and

treatment of symptomatic inmates.

BOP began planning for potential transmissions related to COVID-19 as early as January,

during the same time in which it established a working group to develop COVID-19 policies.  In

accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations

to minimize the risk of COVID-19 transmissions.  Now in Phase Seven of the Action Plan, every

BOP institution requires all inmates to be secured in their assigned cells/quarters.  Limited group

gathering, with social distancing to the extent possible, is permitted to facilitate commissary,

laundry, showers, telephone, and computer access.  BOP is working to distribute face masks to all

staff and inmates and encourages face coverings be worn in public spaces when social distancing

is not feasible.  Excluding medical treatment and similar exigencies, BOP has substantially limited

the movement of inmates and detainees among its facilities.  Official staff travel has also been

cancelled, as has most staff training.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms.

Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical

staff.  Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are

cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC)

criteria for release from isolation.  All facility staff are screened for symptoms in areas with

sustained community transmission.  Staff exhibiting a fever of higher than 100.4 degrees

Fahrenheit are barred from entering the facility.  Similarly, staff members exhibiting a stuffy or

runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case accommodations for visiting attorneys after the attorney has been screened for infection. BOP has increased telephone minute allowances to counteract these limits on in-person interactions.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[2] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). BOP has transferred more than 7,000 inmates to home confinement since March 26, 2020.

### LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his behalf, and the defendant may bring his motion after he has "fully exhausted all administrative

---

[2]     This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [after] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[3] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the term. The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition" or "experiencing deteriorating physical or mental health because of the aging process . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional

---

[3] Despite Section 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded that "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it also "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I) & (III).[4]

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899) (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

## DISCUSSION

### I.     Mr. Williams's exhaustion requirement

Initially, after Mr. Williams filed a *pro se* motion for release, and a *pro se* supplemental motion, the Government opposed his release on the basis that Mr. Williams had not yet met the administrative exhaustion requirements under the applicable statue. As noted, in order for Mr. Williams to present his motions to the Court, he must first seek his relief with the BOP. *See* 18 U.S.C. § 3582(c)(1)(A) ("the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .") This Circuit's court of appeals has noted that

---

[4]     Mr. Williams invokes both provisions.

6

the exhaustion requirements set forth under Section 3582(c)(1)(A) continue to require "strict compliance" even in light of the ongoing COVID-19 pandemic. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).

The Court granted leave for Mr. Williams, through counsel, to file a reply to his motion and supplemental motion. In that reply, Mr. Williams has attached what he purports to be his presentment of his request to the BOP. The attachment is dated April 3, 2020 and states "I fit the criteria for extended home confinement or reduction of sentence due to extraordinary and compelling circumstances. My mother is fighting for her life due to the corona virus. The CDC has stated that the prison population is at high risk and could be decimated due to the virus. . . . [T]he fact that my mother has contracted the virus and is fighting for her life[, a]nd the fact that I am a s[i]tting duck for the virus and can potentially lose my life should compel you to d[o] what's morally right and grant my request." Ex. 1, Def.'s Reply. Counsel for Mr. Williams represents that Mr. Williams's request triggered the 30-day response period under Section 3882(c)(1)(A), and because the BOP failed to act within that time period, the instant motions are not procedurally defaulted. However, even assuming *arguendo*, that Mr. Williams has exhausted his administrative relief, the Court finds Mr. Williams's has not shown extraordinary and compelling reasons for his early release.

II. **Whether Mr. Williams's circumstances are sufficiently extraordinary and compelling.**

Mr. Williams asserts that his age of 52 and his various health conditions, including hypertension, acute bronchitis, and obesity place him at high risk of severe illness were he to contract COVID-19. He also claims that he is required to provide home-care to assist his mother, who was recently released from the hospital after having contracted COVID-19. Mr. Williams

contends that at some point in time, several inmates and two guards had contracted the virus. Mr. Williams also asserts that he has served nearly ten years of imprisonment, and still has 16 years left of his sentence to serve. He represents he has made constructive use of his time while incarcerated, taking training classes which make him eligible for employment.

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing,"[5] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving the present motions still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Turning to Mr. Williams's particular concerns as they relate to COVID-19, the Court concludes that his status does not present extraordinary and compelling reasons to reduce his sentence.

---

[5] Some have understandably suggested that this would be better thought of as "physical distancing," insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

First, it does not appear that Mr. Williams relies on his age alone to justify his early release. Rather, Mr. Williams contends he easily satisfies the requirements set forth in the Sentencing Commissions note, U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(III), because "[t]he standard focuses on diminution (not elimination) of the ability to provide self-care[, and], the government has repeatedly conceded in other cases . . . that a prisoner with a diagnosed, CDC-recognized medical vulnerability satisfies these standards per se[.]" Def.'s Reply, p. 5. Mr. Williams, for additional reasons explained below, has not shown that he suffers from a CDC-recognized and diagnosed medical condition that renders him sufficiently vulnerable to serious illness.[6]

Mr. Williams asserts that his body mass index measurement of 31.2 demonstrates that he suffers from the risk factor of obesity. The CDC very recently reduced it danger threshold for obesity from a body mass index of 40 to one of 30. *See* CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 6, 2020). Pursuant to the CDC's recent reduction, Mr. Williams's obesity is now considered a factor that increases the risk of severe illness from COVID-19. Even so, the fact that Mr. Williams suffers from obesity during the age of the COVID-19 pandemic does not necessarily mean that extraordinary and compelling reasons justify the reduction of his sentence. *See United States v. D'Ambrosio*, No. 15-3, 2020 WL 4260761, at *4-5 (M.D. Pa. July 24, 2020) (denying motion to reduce sentence submitted by defendant concerned about the transmission of COVID-19 who exhibited obesity and high blood pressure).

---

[6]   The Court also notes that the CDC has not identified Mr. Williams's age itself as a high risk factor. *See* CDC, *Older Adults*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited August 6, 2020) (CDC explaining that generally the older an individual gets, the greater the risk for severe illness, but "[t]he greatest risk for severe illness from COVID-19 is among those aged 85 or older.")

The CDC also advises that "serious heart conditions," increase the risk of severe illness from COVID-19.    *See* CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 6, 2020).   Although the CDC recognizes that having certain other conditions, including hypertension or high blood pressure "might be at an increased risk," hypertension is not considered high risk at this time.   *Id.* Nor does the CDC identify acute bronchitis as a condition that increases the risk of COVID-19 complications.

In light of the evidence and CDC guidelines, Mr. Williams does not demonstrate he is at a higher risk for severe illness due to COVID-19 in such a way that would rise to the level of extraordinary and compelling reasons for release.   Mr. Williams also notes that previously, the facility made the ill-advised decision to transfer already infected inmates to FCI Gilmer for quarantine, and at some point in time, there were seven positive confirmed cases among inmates, and two among prison guards.   Nevertheless, as of the filing of the Government's response, July 20, 2020, there are no reported positive cases of COVID-19 at FCI Gilmer.   Thus, it appears that the facility has been responding to and defending against the threats of the virus in a vigorous and generally effective manner. *See United States v. Berry*, No. 10-051-1, 2020 WL 4035457, at *3 (D.N.J. July 17, 2020) ("[G]iven the markedly restrained progression of the virus within FCI Schuylkill, as compared to within the Delaware Valley region generally, BOP's Action Plan appears to be having a positive impact.").   Although the Court in no way trivializes Mr. Williams's health conditions, such ailments, coupled with the present conditions at FCI Gilmer, do not establish extraordinary and compelling reasons justifying his early release.   In the absence of individualized risk, COVID-19, on its own, is not enough to justify release. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the

possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Finally, with respect to Mr. Williams's representation that his mother requires assistance after having been released from intensive care due to contracting the virus, again, the Court does not diminish that Mr. Williams's mother has suffered from the impacts of the virus and may have challenges caring for herself. However, Mr. Williams represents that he has an adult sister who is employed, works from home, and lives with his mother. He also asserts that his adult sister is able to provide some home care, although that assistance may be diminished due to her full-time employment. At this time, the Court does not find these facts rise to the level of extraordinary and compelling.

Therefore, the Court finds that Mr. Williams has failed to meet his burden in demonstrating that extraordinary and compelling reasons justify the reduction of his sentence. Accordingly, he is not entitled to relief pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Williams's motions for release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

11